J-E01004-14

2014 PA Super 289

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JOSE VARGAS, | |
| Appellant | No. 1415 EDA 2012 |

Appeal from the Judgment of Sentence of February 6, 2012
In the Court of Common Pleas of Bucks County
Criminal Division Docket No: CP-09-CR-0001895-2011

BEFORE:   GANTMAN, P.J., FORD ELLIOTT, P.J.E., BENDER, P.J.E.,
PANELLA, DONOHUE, ALLEN, LAZARUS, MUNDY, OLSON, JJ.

OPINION BY OLSON, J.:                                    **FILED DECEMBER 31, 2014**

Appellant, Jose Vargas, appeals from the judgment of sentence entered on February 6, 2012, as made final by the denial of Appellant's post-sentence motion on April 13, 2012.   Although we affirm Appellant's convictions, we must vacate Appellant's judgment of sentence and remand for resentencing.

The trial court has provided us with a thorough and well-written summary of the underlying facts.  As the trial court explained:[1]

---

[1] Within the trial court's opinion, the trial court summarized the evidence that was introduced at the June 6, 2011 pre-trial suppression hearing.  We note that there were slight differences between the evidence that was
*(Footnote Continued Next Page)*

On November 3, 2010, at approximately 10:00 p.m., Officers David Clee and Matthew Tobie of the Bensalem Township Police Department were patrolling the Route 1 corridor in Bensalem. [N.T. Trial, 10/17/11, at 9]. The Route 1 corridor is considered a high-crime area, [and has an] extensive history of arrests for offenses including narcotics, robberies, prostitution[,] and other crimes at the various hotels in the region. [*Id.* at 12].

In the course of their regular patrol, the [o]fficers pulled [their marked patrol car] into the parking lot of the Sunrise Inn on Route 1. . . . Officer Clee is specifically assigned to patrol the Route 1 corridor. As such, he is personally familiar with the crime that takes place in the area and has made numerous arrests along the corridor, including arrests at the Sunrise Inn. [*Id.* at 12]. Upon pulling into the parking lot, the [o]fficers noticed a car with darkly tinted windows parked in the parking lot. Officer Clee immediately recognized that the tint was a violation of [75 Pa.C.S.A. § 4524(e)(1)[2]]. [*Id.* at 15-16].

As they approached the car, a Chevrolet Impala, Officer Clee saw movement inside the vehicle[,] which he described as someone moving from the front passenger's side of the vehicle to the driver's side. [*Id.* at 15. Officer Clee decided to investigate the vehicle. *Id.*] . . .

[Officer Clee] parked his patrol car[, exited his vehicle, and approached the Chevrolet Impala. *Id.* at 15-16]. Officer Clee then . . . began to question the driver. As [Officer Clee was questioning the driver,] Officer Clee observed a

*(Footnote Continued)* —————————

introduced at trial and the evidence that was introduced during the suppression hearing. Therefore, within this memorandum, we have conformed the factual recitation to the evidence that was introduced during the October 17, 2011 trial.

[2] 75 Pa.C.S.A. § 4524(e)(1) declares: "[n]o person shall drive any motor vehicle with any sun screening device or other material which does not permit a person to see or view the inside of the vehicle through the windshield, side wing or side window of the vehicle." 75 Pa.C.S.A. § 4524(e)(1).

baseball cap sitting on the rear floor of the car. Inside the baseball cap were several pieces of jewelry. From his experience, Officer Clee recognized that a baseball cap full of jewelry left in a safe place means the owner of the jewelry anticipated one of two things: [that] he was about to engage in a fight[] or that[,] as a drug dealer[,] he had a fear of being robbed. [*Id.* at 18-19].

The occupant of the vehicle [was] later identified as Melvin Torres [from Camden, New Jersey. During their conversation, Torres] informed Officer Clee that he was not the owner of the vehicle. [*Id.* at 14-16]. Officer Clee questioned Torres in an attempt to ascertain the location of the vehicle's owner[] and to determine [Torres'] connection to the hotel. Despite being questioned only about the ownership of the vehicle, Torres appeared ["extremely nervous"] and was evasive in his responses. . . . *Id.* at 16-17].

After repeated questioning, Torres eventually told Officer Clee that the vehicle's owner . . . was in Room 161 of the hotel. [*Id.* at 17]. . . . After Torres informed [Officer Clee] that the owner of the [Chevrolet] Impala was in Room 161, an individual opened the door to [Room 161] from within, locked eyes with Officer Clee[,] and[, when Officer Clee began to walk towards the room, the individual] quickly closed the door. [*Id.* at 20]. While Officer Tobie remained with Torres, . . . Officer Clee approached Room 161[, "knocked on the door several times[,] and then made an announcement outside that [he] was the police and [he] was inquiring about the owner or operator of the Chevrolet Impala that was occupied in the parking lot." *Id.*] Approximately [45] seconds passed before the door was opened by a person later identified as . . . [Francisco] Saldana. [*Id.* at 21].

Standing outside the room, Officer Clee observed [Saldana,] Appellant[,] and [an individual who was later identified as Raymer Carrasco] standing just inside the doorway. [*Id.*] Officer Clee requested that each of the men produce identification. [Officer Clee] noted that all three [men] were from Camden, New Jersey. [*Id.* at 27]. None of the men identified themselves as the owner of the [Chevrolet]

Impala, and none would claim responsibility for renting the hotel room. [*Id.* at 21-22]. . . .

From the doorway, Officer Clee looked around the room[ and observed "a Tupperware container, two trash bags, and [] a black, . . . wheeled Tupperware container. Additionally, the trash can was . . . full of items, and just between the trash can and the wall was a small apple baggie."[3] *Id.* at 23]. . . .

Acting on the belief, based on his experience, that there might be other people [in the rear bathroom], and the fact that the presence of the [a]pple bag[] indicated there might be illegal activity occurring inside the hotel room, Officer Clee entered the room [and] walk[ed] through the room[ towards the rear] hotel bathroom. [*Id.* at 26]. . . . As he crossed the room, Officer Clee . . . observed at least one portable lamp sticking out of a Tupperware container, in addition to another Tupperware container and a large trash bag. As he passed the trash bag, [Officer Clee] identified more [a]pple bag[s]. *Id.* at 50. . . . [Further, Officer Clee observed a trail of small rubber bands on the floor, with the trail leading to the toilet, and then "two or three small rubber[] bands in the toilet." *Id.* at 26-27. Officer Clee also noticed that the window in the bathroom was open, but that the window was "extremely small, so [the officer] knew that [none] of the three people standing at the door could have got out of it." *Id.* at 27]. . . .

Based on his observations, Officer Clee made the decision to detain all four suspects: the individual from the [Chevrolet] Impala and the three men from the hotel room. Once the men were secured, the[ men] were searched[] and Raymer Carrasco was found to be in possession of [heroin. The heroin in Carrasco's possession was packaged in "clear plastic baggies wrapped in small rubber[] bands" and was later determined to weigh 0.22 grams. *Id.* at 68; Berks County Crime Laboratory Report, dated 11/23/10, at 1].

---

[3] During the suppression hearing, Officer Clee testified that an "apple bag" is a larger plastic bag that "normally contains 500 [] baggies" within it. N.T. Suppression, 6/6/11, at 24.

[A search of Appellant's person revealed that Appellant possessed car keys to a Honda vehicle; the police discovered this Honda vehicle parked next to the Chevrolet Impala in the Sunrise Inn lot. N.T. Trial, 10/17/11, at 29. Further, when questioned as to whether Appellant had any money on his person when he was searched, Officer Clee testified: "I don't recall any money being recovered in this case." ***Id.*** at 49-50.]

Officer Clee then applied for a search warrant for the hotel room, the [Chevrolet] Impala[,] and [the] Honda [automobile that was parked next to the Chevrolet Impala (and to which Appellant possessed the keys)]. The four suspects were transported to the police station and the room was secured until a search warrant was obtained. [***Id.*** at 30].

Once the search warrant was obtained, all the evidence located in the hotel room was brought back to the police station to be inventoried. Inside the containers and garbage bag located in the hotel room, police found [six coffee] grinders [that were used to grind heroin], [coffee filters that were used in the heroin-grinding process,] three lamps, thousands of glassine baggies, several digital scales, rubber stamps, wax paper[s that were stamped with brand-insignia and that are ordinarily used to bag heroin], and other items of drug paraphernalia. [***Id.*** at 43-49]. All of the grinders[, filters,] and scales tested positive for residue of heroin or cocaine. [***Id.***; ***see also*** Bucks County Crime Laboratory Report, dated 12/13/10, at 1. Moreover, e]mpty condom[s] . . . were found in the hotel trash can. [N.T. Trial, 10/17/11, at 47]. [None of the four individuals were the named renter of the hotel room; none of the four individuals possessed any "luggage or overnight bags." ***Id.*** at 21-22, 31, and 50].

The cars were [] transported to the [police] station so [that] they could be searched. The officers located a concealed compartment in the dashboard of the [Chevrolet] Impala that contained a .40-caliber handgun and [377.73 grams of uncut heroin, some of which was packaged in rubber condoms "for transportation in a human body." ***Id.*** at 32-35; ***see also*** Bucks County Crime Laboratory Report, dated

11/23/10, at 1. Officer Clee testified that the heroin-filled condoms were "extremely similar" to the empty condoms that were found in the hotel room trash can. N.T. Trial, 10/17/11, at 47. In like fashion, Commonwealth expert, Detective Timothy Carroll, also testified that the heroin-filled condoms found in the Chevrolet Impala were "very similar, if not identical" to the "used empty condom[s]" that were found in the hotel room. *Id.* at 90-91. Further, within the Chevrolet Impala, the police discovered an "owe sheet"[4] in the vehicle's trunk, as well as an additional ledger that was sitting on the vehicle's front seat. *Id.* at 36]. . . .

[Saldana] was identified as the person responsible for the [Chevrolet] Impala. [*Id.* at 22]. Although no illegal substances or contraband of any sort were found in the Honda [to which Appellant possessed the keys], when Officer Clee introduced his trained narcotics dog to the [Honda, the dog] alerted to the presence of an illegal substance. [*Id.* at 28-30]. The K-9 also alerted to the presence of an illegal substance in the [Chevrolet] Impala, which was consistent with the findings of the search. [*Id.*]

On November 4, 2010, Appellant was charged with [a number of crimes, including possession of a controlled substance with the intent to deliver (hereinafter "PWID"), possession of a controlled substance, possession of drug paraphernalia, and criminal conspiracy.]

Trial Court Opinion, 7/10/12, at 1-6 (internal citations omitted).

On August 18, 2011, Commonwealth provided Appellant with notice that, in the event Appellant was convicted of PWID, the Commonwealth intended to seek the five-year mandatory minimum sentence under 18 Pa.C.S.A. § 7508(a)(7)(iii), because "the aggregate weight of the compound

---

[4] Officer Clee testified that "[a]n owe sheet is a record that someone is owing them money for anything. These sheets, specifically the items recovered in the trunk of the vehicle, appear to be daily amounts that people are making off a corner for ounces and grams of something." N.T. Trial, 10/17/11, at 60.

or mixture containing the heroin [was] 50 grams or greater." 18 Pa.C.S.A. § 7508(a)(7)(iii).

On October 17, 2011, Appellant proceeded to a bench trial, where the Commonwealth presented the above-summarized evidence. Moreover, during trial, Appellant stipulated to the authenticity and accuracy of a Bucks County Crime Laboratory report, which declared that the substance in Mr. Saldana's vehicle was heroin and that the heroin in Mr. Saldana's vehicle weighed 377.73 grams.[5] N.T. Trial, 10/17/11, at 39-41; Bucks County Crime Laboratory Report, dated 11/23/10, at 1.

During trial, the Commonwealth presented the testimony of Detective Timothy Carroll, whom the trial court accepted as an expert in the field of narcotics trafficking. Detective Carroll testified that – based upon his training, education, and experience, and upon the evidence of the case – all of the heroin in this case was possessed with the intent to deliver. N.T. Trial, 10/17/11, at 87. Indeed, Detective Carroll testified that the operation in the hotel room constituted a "mobile heroin mill," where the defendants cut raw heroin and proceeded to weigh and package the cut heroin into the small wax baggies. *Id.* at 87-88. As Detective Carroll testified:

> This is a matter, your Honor, really of a portable or mobile heroin mill. This heroin was possessed with the intent to

---

[5] Appellant also stipulated to the chain of custody regarding all of the items that were tested by the Bucks County Crime Laboratory. N.T. Trial, 10/17/11, at 39-40.

package into these wax paper bags. It's also obvious that some of it had been packaged and probably had left the room prior to that. The pellets are evidence of the actual raw heroin that was brought to the room. There is mannitol present, which would be used as cut to adulterate the heroin before it's packaged in those small blue wax baggies, and there's presence of actual new unstamped bags as well as stamped bags that are packaged and unpackaged and there's the presence of the actual stamps and heat sealers.

There is a plethora of evidence, really . . . that shows this is really a heroin mill.

N.T. Trial, 10/17/11, at 87-88.

Detective Carroll testified that, judging from the paraphernalia and residue that was discovered in the hotel room, the defendants had probably cut and packaged "thousands of bags of heroin" before the police arrived; the detective testified that the bags of cut heroin had then "left the [hotel] room" for ultimate sale "at the street level." *Id.* at 87, 89, and 90.

With respect to the remaining 377.73 grams of raw, uncut heroin that was discovered in Mr. Saldana's vehicle, Detective Carroll testified:

A gram of heroin is usually broken down into about 35 of these heroin packets. Those heroin packets retail for about $10[.00] a piece. Of course, they discount by quantity; if you buy a bundle you pay maybe 60 percent on the dollar.

I believe there were 376[6] grams [of uncut heroin left]. If you do the math, you're talking about 13,000 baggies that

_____

[6] As noted above, Appellant stipulated to the authenticity and accuracy of the Bucks County Crime Laboratory report, which declared that the substance in Mr. Saldana's vehicle was heroin and that the heroin weighed 377.73 grams. N.T. Trial, 10/17/11, at 39-41. Appellant also stipulated to the chain of custody regarding the items that were tested. *Id.* at 39-40.

> possibly could have been produced here in this mill from what was left, what was discovered by the police, not counting the cut and not counting what was apparently already packaged.

*Id.* at 92.

Detective Carroll testified that the approximate street value of the seized heroin was "well over a hundred thousand dollars." *Id.*

During trial, the Commonwealth also introduced a surveillance video of the hotel parking lot, which was recorded on November 3, 2010. N.T. Trial, 10/17/11, at 41-42. As the video showed, at 10:03 p.m. on the night in question, Mr. Saldana drove his Chevrolet Impala into Sunrise Inn parking lot.[7] *See* N.T. Suppression Hearing, 6/6/11, at 13.[8] After parking his vehicle, Mr. Saldana exited the car carrying nothing, and walked empty-handed towards Room 161. *Id.* at 13-14. Mr. Saldana then knocked on the door to Room 161, and someone from inside Room 161 opened the door to allow Mr. Saldana entry into the hotel room. *Id.* Approximately one minute later, Officers Clee and Tobie drove their patrol car into the Sunrise Inn parking lot, and the above-summarized events transpired. *Id.* at 14-18.

---

[7] The surveillance video began at 10:00 p.m. and ended two hours later, at 12:00 a.m.

[8] During Appellant's trial, the parties stipulated to the admissibility of the surveillance video. N.T. Trial, 10/17/11, at 41-42. The parties also agreed that the surveillance video admitted at trial was "the same video" the trial court viewed during the June 6, 2011 suppression hearing. *Id.* at 42.

The trial court found Appellant guilty of PWID, possession of a controlled substance, possession of drug paraphernalia, and criminal conspiracy.[9] *Id.* at 111. On February 6, 2012, the trial court sentenced Appellant to serve the mandatory minimum sentence of five to ten years in prison for PWID, in accordance with 18 Pa.C.S.A. § 7508(a)(7)(iii).[10] N.T. Sentencing, 2/6/12, at 32.

On February 16, 2012, Appellant filed a timely post-sentence motion. Following a hearing, the trial court denied Appellant's motion and Appellant filed a timely notice of appeal to this Court.

Within Appellant's initial brief on appeal, Appellant claimed that the evidence was insufficient to support his convictions and that the trial court erred when it sentenced him to serve the mandatory minimum term under 18 Pa.C.S.A. § 7508(a)(7)(iii). Over the dissent of the Honorable Mary Jane Bowes, a three-judge panel of this Court initially concluded that the evidence was insufficient to sustain Appellant's convictions. *Commonwealth v. Vargas*, 1415 EDA 2012 (Pa. Super. filed July 8, 2013) (unpublished memorandum) (withdrawn) at 15-19. According to the panel majority, the Commonwealth had not proven that Appellant constructively possessed the

---

[9] 35 P.S. § 780-113(a)(30), (16), and (32), and 18 Pa.C.S.A. §§ 903(a), respectively.

[10] The trial court also sentenced Appellant to serve a concurrent term of ten years' probation for the conspiracy conviction.

- 10 -

contraband in either the hotel room or Mr. Saldana's vehicle. The panel majority also held that the Commonwealth had failed to prove that Appellant conspired to commit any crime. Rather, the panel majority held, the Commonwealth had merely proven Appellant's "presence in the hotel room" and Appellant's "shared access to [the] drug-packaging paraphernalia" in the hotel room. *Id.* at 19.

In her comprehensive and well-written dissent, Judge Bowes argued that, in reaching its decision, the panel majority had disregarded our standard of review, taken a myopic view of the Commonwealth's evidence, failed to draw all reasonable inferences from the evidence in favor of the Commonwealth as the verdict winner, and re-weighed the evidence in Appellant's favor. As Judge Bowes wrote:

> This is not a case where the evidence is so weak and inconclusive that no probability of fact can be drawn from the combined circumstances. . . . Here, viewing the evidence in a light most favorable to the Commonwealth, thereby giving it the benefit of the reasonable inferences derived therefrom, the pertinent proof is sufficient to establish the aforementioned crimes. Appellant was inside a [hotel] room with two other individuals while a third person remained outside in a Chevy Impala with a New Jersey license plate. The person in the Impala had indicated to police that the owner of the car was in the [hotel] room where police located Appellant. Police secured a search warrant for the [hotel] room and found four bags of heroin on another individual who was in the hotel room with Appellant. Also, police observed a large [Ziploc] bag that ordinarily contains smaller [Ziploc] bags, which one officer described as being used almost exclusively for the packaging of narcotics. Rubber bands, frequently used in packaging drugs, were found floating in the toilet, which appeared to have been flushed just before police arrived.

Drug sniffing dogs performed a sniff on the outside of both Appellant's car and the Impala, which belonged to Francisco Saldana, one of the men who was inside the [hotel] room with Appellant. The dog alerted on both cars. Police then obtained a search warrant for the vehicles. Inside Mr. Saldana's car, police found a bag containing over 370 grams of heroin and a loaded .40 caliber semi-automatic pistol. These items were located in a secret compartment in the vehicle. Part of the drugs found in Mr. Saldana's vehicle were packaged in balloon and condom-like wrappers. . . .

Inside the hotel room, an industrial-sized trash bag and large blue plastic containers were seized. The bag and containers as well as a trash can in the room contained numerous items used to package heroin, including rubber stamps, wax paper, digital scales, empty condom wrappers similar if not identical to those used to package the drugs in Mr. Saldana's car, thousands of one-inch-by-one-inch [Ziploc] bags, grinders, and lamps. The trash bag and plastic containers were on the floor of the [hotel] room and were not hidden. Six grinders and two scales tested positive[] for either cocaine or heroin residue. Additional packaging in the room tested positive[] for heroin residue. A surveillance video of Mr. Saldana entering the [hotel] room showed that he had arrived at the hotel shortly before [the] police and had entered the [hotel] room without any of the plastic containers or trash bag. No luggage or bags were located in Appellant's vehicle. Expert testimony was introduced that the materials recovered indicated a mobile heroin packaging mill.

Only by setting aside our standard of review can this evidence be viewed as Appellant merely being present while others were packaging heroin for purposes of distribution.

***Commonwealth v. Vargas***, 1415 EDA 2012 (Pa. Super. filed July 8, 2013)

(unpublished memorandum) (Bowes, J., dissenting) (withdrawn) at 2-4.

The Commonwealth filed an application for reargument and, on September 13, 2013, this Court granted the Commonwealth's application.

- 12 -

We thus withdrew the prior panel decision and listed the case for *en banc* consideration. Order, 9/13/13, at 1. Appellant now raises the following claims to this Court:

> [1.] Where the evidence at trial established only that [Appellant] was merely present in a hotel room where drug-packaging paraphernalia was recovered, was the evidence sufficient to sustain the verdict[]?
>
> [2.] Did the [trial court] err by imposing the mandatory minimum [sentence] under [18 Pa.C.S.A. § 7508] where the controlled substance in question was not in the actual or constructive possession of [Appellant]?

Appellant's Brief at 5.

Appellant first claims that the evidence was insufficient to support his convictions. Appellant's claim is based entirely upon his contention that the evidence "only showed [] Appellant's mere presence in [the] hotel room." Appellant's Brief at 8. According to Appellant, since "the Commonwealth's evidence established nothing more [than] presence alone in conjunction with access to the contraband[, the Commonwealth] did not establish that Appellant was in possession of the drugs . . . [and the Commonwealth] also failed to demonstrate that [] Appellant was part of a conspiracy." ***Id.*** at 13 and 15.

Appellant's claim fails. Viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, the evidence in this case was sufficient to show that: Appellant constructively possessed the heroin residue and drug paraphernalia that was discovered in the "heroin

mill" of a hotel room; Appellant was engaged in an active, ongoing conspiracy with Messrs. Saldana and Carrasco – the purpose of which was to cut and package raw heroin "for sale at the street level;" as part of the conspiracy, Appellant, Mr. Saldana, and Mr. Carrasco intended to cut and package the 377.73 grams of raw, uncut heroin that was discovered in Mr. Saldana's vehicle; and, as a member of the ongoing conspiracy with Mr. Saldana, Appellant is criminally liable for the substantive offense of possessing the 377.73 grams of raw, uncut heroin that was discovered in Mr. Saldana's vehicle.

We review Appellant's sufficiency of the evidence claim under the following standard:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Brown*, 23 A.3d 544, 559-560 (Pa. Super. 2011) (*en banc*), *quoting* *Commonwealth v. Hutchinson*, 947 A.2d 800, 805-806 (Pa. Super. 2008).

At the outset, we reject Appellant's claim that the evidence was insufficient to prove that Appellant constructively possessed the heroin residue and drug paraphernalia in the hotel room.

"In narcotics possession cases, the Commonwealth may meet its burden by showing actual, constructive, or joint constructive possession of the contraband." *Commonwealth v. Thompson*, 428 A.2d 223, 224 (Pa. Super. 1981). Actual possession is proven "by showing . . . [that the] controlled substance [was] found on the [defendant's] person." *Commonwealth v. Macolino*, 469 A.2d 132, 134 (Pa. 1983). If the contraband is not discovered on the defendant's person, the Commonwealth may satisfy its evidentiary burden by proving that the defendant had constructive possession of the drug. *Id.*

Our Supreme Court has defined constructive possession as "the ability to exercise a conscious dominion over the illegal substance: the power to control the contraband and the intent to exercise that control." *Macolino*, 469 A.2d at 134. In the words of our Supreme Court, "constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement." *Commonwealth v. Johnson*, 26 A.3d 1078, 1093 (Pa. 2011) (internal quotations, citations, and corrections omitted). It

is a "judicially created doctrine . . . [that] enables law enforcement officials to prosecute individuals in situations where the inference of possession is strong, yet actual possession at the time of arrest cannot be shown." Mark I. Rabinowitz, Note, *Criminal Law Constructive Possession:    Must the Commonwealth Still Prove Intent? – **Commonwealth v. Mudrick***, 60 TEMPLE L.Q. 445, 499-450 (1987).

To find constructive possession, the power and intent to control the contraband does not need to be exclusive to the defendant.  Our Supreme Court "has recognized that constructive possession may be found in one or more actors where the item [at] issue is in an area of joint control and equal access." ***Johnson***, 26 A.3d at 1094 (internal quotations, citations, and corrections omitted).  Nevertheless, "where more than one person has equal access to where drugs are stored, presence alone in conjunction with such access will not prove conscious dominion over the contraband." ***Commonwealth v. Davis***, 480 A.2d 1035, 1045 (Pa. 1984) (emphasis omitted).

For the Commonwealth to prove constructive possession where more than one person has access to the contraband, "the Commonwealth must introduce evidence demonstrating either [the defendant's] participation in the drug related activity or evidence connecting [the defendant] to the specific room or areas where the drugs were kept." ***Commonwealth v. Ocasio***, 619 A.2d 352, 354-355 (Pa. Super. 1993).  However, "[a]n intent

to maintain a conscious dominion may be inferred from the totality of the circumstances . . . [and] circumstantial evidence may be used to establish a defendant's possession of drugs or contraband." *Macolino*, 469 A.2d at 134-135 (internal citations omitted). Moreover, we agree with the statement from the United States Court of Appeals for the Tenth Circuit that, although "mere presence" at a crime scene cannot alone sustain a conviction for possession of contraband:

> a jury need not ignore presence, proximity and association when presented in conjunction with other evidence of guilt. Indeed, presence at the scene where drugs are being processed and packaged is a material and probative factor which the jury may consider. Drug dealers of any size and [illegal drug] manufacturers probably are reticent about allowing the unknowing to take view of or assist in the operation.

*United States v. Robinson*, 978 F.2d 1554, 1157-1158 (10th Cir. 1992) (internal quotations and citations omitted); *see also Rivas v. United States*, 783 A.2d 125, 138 (D.C. 2001) (*en banc*) ("a claim of innocent presence becomes decidedly less plausible in an environment (vehicular or otherwise) that is rife with evidence of ongoing drug production or distribution, such as a manufacturing or cutting facility, a warehouse, or a staging or preparation area where a large quantity of drugs or drug paraphernalia is exposed to view"); *United States v. Batista-Polanco*, 927 F.2d 14, 18 (1st Cir. 1991) (casting doubt upon the "hypothesis that participants in a [large-scale heroin packaging] scheme would permit a noncontributing interloper to remain for an extended period of time in a

small apartment while their conspicuous criminal conduct continued unabated [since s]uch is not normally the conduct that one would expect of conspirators engaged in conduct which by its nature is kept secret from outsiders") (internal quotations, citations, and corrections omitted); *United States v. Staten*, 581 F.2d 878, 885 n.67 (D.C. Cir. 1978) ("[i]t would seem that the voluntary presence of the accused in an area obviously devoted to preparation of drugs for distribution is a circumstance potently indicative of his involvement in the operation").

Viewing the evidence in the light most favorable to the Commonwealth, the evidence in the case at bar was sufficient to prove that Appellant constructively possessed the heroin residue and the drug paraphernalia that was discovered in the hotel room. Indeed, a review of the totality of the circumstances reveals the following facts and permissible inferences, which – taken together – are sufficient to prove that Appellant possessed "the power to control the contraband [in the hotel room] and the intent to exercise that control." *Macolino*, 469 A.2d at 134.

First, Appellant was caught in a single, open hotel room, with drug-cutting and drug-packaging material strewn about the room, in plain view. Taken together, these circumstances furnished a sound basis for the fact-finder to reject the claim that Appellant was unaware of the substantial heroin-cutting and heroin-packaging operation that was occurring within his midst, in the confined space of a hotel room.

Second, the Commonwealth introduced expert testimony that the operation in the hotel room constituted a multi-person "mobile heroin mill" – where raw heroin was cut, weighed, and then packaged into baggies for sale "at the street level." N.T. Trial, 10/17/11, at 87, 89, and 90. As the Tenth Circuit has explained, Appellant's presence in the middle of such an operation is highly probative and supports the inference that Appellant was an active participant in the activity. Indeed, as the Tenth Circuit explained, it is common knowledge that "[d]rug dealers of any size and [illegal drug] manufacturers probably are reticent about allowing the unknowing to take view of or assist in the operation." **Robinson**, 978 F.2d at 1157-1158.

Third, Appellant's "mere presence" claim is further undercut by the fact that he was caught in a hotel room – rather than in an individual's residence – and that no luggage was found in the hotel room or in Appellant's vehicle. These facts support a permissible inference that the hotel room was being used for one purpose: a mobile heroin mill. These facts also support a permissible inference that Appellant was not merely visiting the individuals in the hotel room (as he might if the operation had been conducted in one of the individuals' residences) but that Appellant was an active participant in the only activity that was being conducted in the room: the cutting and packaging of heroin.

Fourth, and on a related note, there is no evidence that the hotel room was being used as a place for the illegal sale of heroin. Most tellingly, there

was no evidence that the police seized any money in this case. **See** N.T. Trial, 10/17/11, at 1-112. Further, at trial, Officer Clee was asked whether "any money [was] found on [Appellant's] person" during the search; Officer Clee answered: "I don't recall any money being recovered in this case." **Id.** at 49-50. Admittedly, under a *de novo* standard of review, a fact-finder could ascribe a variety of different meanings to Officer Clee's answer, including that Officer Clee actually did not remember whether any money was recovered in this case. We observe, however, that "I don't recall" is a common idiomatic expression, which means "no." **See**, **e.g.**, **S.E.C. v. Woodruff**, 778 F.Supp.2d 1073, 1094 n.24 (D.Colo. 2011) (recognizing the idioms "I don't believe" and "I don't recall"). Since our review of Appellant's sufficiency of the evidence challenge requires that we interpret Officer Clee's answer in the light most favorable to the Commonwealth, we view Officer Clee's answer as supporting the conclusion that Appellant possessed no money at the time he was searched and that no money was found in the hotel room. Thus, when combined with the actual evidence in the case (which demonstrates that the police recovered no money from Appellant, Appellant's co-defendants, or the hotel room), Officer Clee's testimony further negates any suggestion that Appellant was present in the hotel room merely to purchase the heroin.

Fifth, the evidence at trial supports the inference that Appellant was, at the very least, complicit in the destruction of evidence. At trial, Officer

Clee testified that, when he was questioning Mr. Torres in the parking lot, he noticed an individual open the door to Room 161 and look directly at the officer. N.T. Trial, 10/17/11, at 20. Officer Clee testified that, right when he began to walk towards the room, the individual shut the door. *Id.* In response, Officer Clee testified that he approached Room 161, "knocked on the door several times[,] and then made an announcement outside that [he] was the police and [he] was inquiring about the owner or operator of the Chevrolet Impala that was occupied in the parking lot." *Id.* Officer Clee testified that it took approximately 45 seconds for Mr. Saldana to open the door to the small hotel room – and that, when Officer Clee entered the room, the officer discovered a trail of small rubber bands on the floor, with the trail leading to the toilet, and then "two or three small rubber[] bands in the toilet." *Id.* at 20-21.

Viewing this evidence in the light most favorable to the Commonwealth, the evidence supports the inference that the individuals in the hotel room flushed some of the contraband down the toilet. Moreover, even if Appellant did not actively take part in flushing the contraband down the toilet, Appellant's failure to answer the door when Officer Clee knocked – while his compatriots flushed the contraband down the toilet – demonstrates that Appellant was, at the very least, complicit in the destruction of evidence.

Sixth, the evidence at trial supports the inference that Appellant brought all of the drug-cutting and drug-packaging paraphernalia to the hotel room in the Honda automobile. At trial, Officer Clee testified that a search of the three individuals in the hotel revealed that the individuals only possessed vehicle keys to two cars: the Honda vehicle and the Chevrolet Impala. Appellant possessed the vehicle keys to the Honda and video evidence revealed that Mr. Saldana operated the Chevrolet Impala. N.T. Trial, 10/17/11, at 22 and 29.

Officer Clee testified that a trained narcotics dog alerted to the presence of narcotics on both the Honda and the Chevrolet Impala – and, while heroin was discovered in Mr. Saldana's Chevrolet Impala, no narcotics were discovered in the vehicle to which Appellant possessed the keys. *Id.* at 28-30. Nevertheless, the narcotics and the large amounts of paraphernalia in the hotel room needed to get into the room some way and surveillance video demonstrated that, when Mr. Saldana arrived at the hotel in his Chevrolet Impala, Mr. Saldana parked his vehicle in the lot and walked empty-handed into the hotel room.

Viewing this evidence in the light most favorable to the Commonwealth, it was permissible for the fact-finder to infer that the dog alerted to Appellant's vehicle because Appellant brought much, if not all, of the drug-cutting and drug-packaging paraphernalia into the hotel room –

and, therefore, that Appellant constructively possessed the contraband found in the hotel room.

From the above, it is apparent that the Commonwealth's case against Appellant was based upon far more than Appellant's "mere presence in [the] hotel room." **See** Appellant's Brief at 8. Indeed, viewing the evidence in the light most favorable to the Commonwealth, the evidence is sufficient to support the trial court's conclusion that Appellant was an active participant in the drug-cutting and drug-packaging operation that was being conducted in the hotel room – and that Appellant possessed both "the power to control the contraband [in the hotel room] and the intent to exercise that control." **Macolino**, 469 A.2d at 134.

We note that, within Appellant's brief to this Court, Appellant claims that the factual pattern of this case is "strikingly analogous" to the factual pattern of **Commonwealth v. Ocasio**. 619 A.2d 352 (Pa. Super. 1993). According to Appellant, since the **Ocasio** Court held that the evidence was insufficient to show that the defendant constructively possessed the contraband, we must likewise conclude that the evidence was insufficient to support Appellant's convictions. Appellant's Brief at 12-14. Appellant's argument fails because the underlying facts in **Ocasio** were far less incriminating than the facts in the case at bar.

In **Ocasio**, the police executed a search warrant for 2128 North Second Street, in Philadelphia. The residence was a multi-bedroom house,

which housed multiple residents. *Ocasio*, 619 A.2d at 353. During the ensuing search, the police heard one of the co-defendants declare, in Spanish, "it's in the trash." *Id.* A search of the kitchen trashcan uncovered 12 baggies containing 567 vials of crack cocaine. *Id.* The police searched the rest of the house and discovered: in a third floor bedroom, "a baggie containing a large chunk of crack cocaine" and $5,882.00; in the basement, "a triple beam scale, one baggie containing numerous empty clear plastic vials with gray and black caps, two strainers, and one baggie containing numerous empty clear smaller packets;" and, in an unspecified area of the house, a plastic grinding apparatus and "a substance commonly used to dilute or 'cut' cocaine before selling it." *Id.*

Mr. Ocasio returned home during the search and the officers on scene arrested him. A search of Mr. Ocasio's person revealed $422.00 in small denominations and a driver's license, which declared that Mr. Ocasio's residence was 2128 North Second Street. *Id.* A jury subsequently found Mr. Ocasio guilty of PWID and criminal conspiracy.

On appeal, Mr. Ocasio claimed that the evidence proved only his "presence" in the house and that the Commonwealth thus failed to prove he constructively possessed the contraband. We agreed with Mr. Ocasio and vacated his convictions. *Id.*

Within our Opinion, we noted that Mr. Ocasio "was present at the scene of the crime and, as a resident, had access to the drugs in the house."

*Id.* at 354. We explained, however, that since other individuals had equal access to the drugs in the house, the Commonwealth was required to prove more than Mr. Ocasio's "mere presence" in the house. *Id.* Rather, we held that the Commonwealth needed to introduce evidence "demonstrating either [Mr. Ocasio's] participation in the drug related activity or evidence connecting [Mr. Ocasio] to the specific room or areas where the drugs were kept." *Id.* at 354-355.

We concluded that the Commonwealth failed its burden, as "[t]he only evidence linking [Mr. Ocasio] to any drug related activity [was] the $422[.00 in] cash found in his pocket at the time of his arrest" – and this limited evidence was insufficient to prove that Mr. Ocasio was involved in drug sales or in the drug packaging and distribution that was occurring at the residence where the warrant had been executed. *Id.* at 355. Moreover, we concluded that there was no evidence linking Mr. Ocasio to any room in which the contraband was discovered and that there was no evidence that Mr. Ocasio "even knew of the criminal activity in the house." *Id.* Finally, we concluded that, even though Mr. Ocasio was present at the scene of a crime, "[a]s a resident of the house, [Mr. Ocasio's] presence at the scene of the crime was not out of the ordinary." *Id.*

Appellant's reliance upon *Ocasio* cannot succeed, as the evidence in the case at bar is far more incriminating than the evidence that was present in *Ocasio*. To start, unlike Mr. Ocasio, Appellant simply cannot persuasively

claim that he was unaware of the criminal activity that was occurring in the hotel room.  Indeed, Appellant was caught in a single, open hotel room, with drug-cutting and drug-packaging material in plain view and strewn about the confined space.

Moreover, when the police arrested Mr. Ocasio, Mr. Ocasio was inside of his own residence – where he had a legitimate right to be – and the police did not discover any contraband in any room in which Mr. Ocasio exclusively controlled.  In the case at bar, however, the evidence demonstrates that Appellant drove to an out-of-state hotel, with no overnight luggage, and was found inside of a room that was being used exclusively as a "mobile heroin mill" – and, thus, for no legitimate purpose.  Echoing the District of Columbia Court of Appeals, Appellant's claim of "innocent presence" in such an incriminating and secretive environment is "decidedly less plausible" than was the claim in **Ocasio**.  **Rivas**, 783 A.2d at 138.

Finally, the **Ocasio** Court held that (beyond Mr. Ocasio's mere presence in his own residence) there was a dearth of evidence supporting Mr. Ocasio's convictions.  In the case at bar, however, the Commonwealth introduced additional evidence supporting the inference that Appellant constructively possessed the contraband in the hotel room.  Indeed, as summarized above, the Commonwealth introduced evidence supporting the inference that Appellant was, at the very least, complicit in the destruction

of contraband and that Appellant transported the drug-cutting and drug-packaging paraphernalia to the hotel room.

Appellant's dependence upon **Ocasio** thus does not entitle him to relief.[11]   The evidence in the case at bar is sufficient to support the trial court's conclusion that Appellant was an active participant in the drug-cutting and drug-packaging operation that was being conducted in the hotel room and that Appellant possessed "the power to control the contraband [in the hotel room] and the intent to exercise that control."   **Macolino**, 469 A.2d at 134.

Moreover, we conclude that the evidence is sufficient to support the trial court's conclusion that Appellant and Mr. Saldana conspired to cut and package for sale the 377.73 grams of raw, uncut heroin that was discovered in Mr. Saldana's vehicle.   As such, the evidence is sufficient to support

---

[11]   In support of his sufficiency claim, Appellant also cites to **Commonwealth v. Valette**.   613 A.2d 548 (Pa. Super. 1992).   However, from Appellant's standpoint, the facts of **Valette** are even weaker than the facts of **Ocasio**.   Therefore, we will not separately analyze **Valette**.   **See Valette**, 613 A.2d at 548 (the police raided a two story apartment and arrested Mr. Valette, along with multiple people who were present at the time of the raid; a search revealed that contraband was secreted in various places throughout the apartment; while the Commonwealth produced evidence that Mr. Valette's co-defendants lived in the apartment, there was no evidence that Mr. Valette resided in the apartment and the police discovered no contraband on Mr. Valette's person; we held that, since "the record demonstrates nothing more than that [Mr. Valette] was present in an apartment in which drugs were found," the evidence was insufficient to support Mr. Valette's conviction for possession).

Appellant's conviction for the substantive offense of PWID, insofar as it related to the raw and uncut heroin.

As our Supreme Court has explained: "to sustain a conviction for criminal conspiracy, the Commonwealth must establish that the defendant (1) entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and (3) an overt act was done in furtherance of the conspiracy." *Commonwealth v. Fisher*, 80 A.3d 1186, 1190-1191 (Pa. 2013) (internal quotations, citations, and corrections omitted); *see also* 18 Pa.C.S.A. § 903. We have held:

> The essence of a criminal conspiracy is the common understanding that a particular criminal objective is to be accomplished. Mere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient. Rather, the Commonwealth must prove that the defendant shared the criminal intent, *i.e.*, that the Appellant was an active participant in the criminal enterprise and that he had knowledge of the conspiratorial agreement. The defendant does not need to commit the overt act; a co-conspirator may commit the overt act.

*Commonwealth v. Lambert*, 795 A.2d 1010, 1016 (Pa. Super. 2002) (*en banc*) (internal quotations and citations omitted).

"Proof of a conspiracy is almost always extracted from circumstantial evidence. The Commonwealth may present a 'web of evidence' linking the defendant to the conspiracy beyond a reasonable doubt. The evidence must, however, rise above mere suspicion or possibility of guilty collusion." *Commonwealth v. Hennigan*, 753 A.2d 245, 253 (Pa. Super. 2000) (internal quotations and citations omitted). We have held that, "[a]mong

the circumstances which are relevant, but not sufficient by themselves, to prove a corrupt confederation are: (1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy." *Lambert*, 795 A.2d at 1016 (internal quotations and citations omitted). Moreover:

> Once there is evidence of the presence of a conspiracy, conspirators are liable for acts of co-conspirators committed in furtherance of the conspiracy. Even if the conspirator did not act as a principal in committing the underlying crime, he is still criminally liable for the actions of his co-conspirators taken in furtherance of the conspiracy.
>
> . . .
>
> The premise of the rule is that the conspirators have formed together for an unlawful purpose, and thus, they share the intent to commit any acts undertaken in order to achieve that purpose, regardless of whether they actually intended any distinct act undertaken in furtherance of the object of the conspiracy. It is the existence of shared criminal intent that is the *sine qua non* of a conspiracy.

*Lambert*, 795 A.2d at 1016-1017 (internal quotations and citations omitted). "The duration of a conspiracy depends upon the facts of the particular case, that is, it depends upon the scope of the agreement entered into by its members." *Johnson*, 26 A.3d at 1092 (internal quotations and citations omitted).

As stated above, the only remaining issue with respect to Appellant's sufficiency of the evidence claim is whether the conspiracy between Appellant and Mr. Saldana encompassed, as its object, the cutting and

packaging of the 377.73 grams of uncut heroin that was discovered in Mr. Saldana's vehicle. We conclude that the evidence was sufficient to support this conclusion.

We have explained that the evidence at trial was sufficient to support the trial court's conclusion that Appellant was an active participant in an ongoing, multi-person "mobile heroin mill," where raw heroin was cut, weighed, and packaged for sale "at the street level." Moreover, viewing the evidence in the light most favorable to the Commonwealth, the evidence at trial demonstrated that the hotel room within which the operation was being conducted was being used **exclusively** for the cutting and packaging of raw heroin – and that Appellant and his compatriots had already cut and packaged "thousands of bags of heroin" before the police arrived. Further, Detective Carroll testified that, by the time the police arrived, the "thousands of bags" of cut and packaged heroin had already "left the [hotel] room" for ultimate sale "at the street level." N.T. Trial, 10/17/11, at 87, 89, and 90.

Under such circumstances, it takes a very small inferential step to conclude that Appellant and Mr. Saldana understood, agreed, and intended to cut, weigh, and package for sale the 377.77 grams of raw heroin that was discovered in Mr. Saldana's vehicle. To be sure, the facts of this case demonstrate that Mr. Saldana transported "well over a hundred thousand dollars" of raw heroin to an out-of-state hotel and then entered a room

where the only activity being conducted was the cutting of raw heroin and the packaging of the cut heroin for sale on the street. Indeed, the grinders, scales, lamps, stamps, and packaging materials were consistent with the items needed to process raw heroin such as that found in Mr. Saldana's vehicle.

Moreover, the evidence at trial demonstrated that some of the raw heroin discovered in Mr. Saldana's vehicle was packaged in rubber condoms "for transportation in a human body;" and, as Detective Carroll testified, the heroin-filled condoms found in Mr. Saldana's vehicle were "very similar, if not identical" to the "used empty condom[s]" that were found in the hotel room. N.T. Trial, 10/17/11, at 90-91. Since the evidence at trial demonstrates that Appellant and his compatriots had already cut and packaged "thousands of bags" of raw heroin before the police arrived, a fair inference from the evidence is that the "used empty condom[s]" in the hotel room had previously been filled with raw heroin, and that Appellant and his compatriots had already cut and packaged the heroin that had filled those condoms. Further, since the heroin-filled condoms in Mr. Saldana's vehicle were "very similar, if not identical" to the "used empty condom[s]" in the hotel room, the fact-finder could have fairly inferred that Appellant and Mr. Saldana had intended to cut and package the raw heroin that filled the condoms in Mr. Saldana's vehicle.

Simply stated, the evidence in this case was not "so weak and inconclusive that as a matter of law no probability of fact [could have been] drawn from the combined circumstances." **Brown**, 23 A.3d at 559-560 (internal quotations and citations omitted). Rather, viewing the evidence in the light most favorable to the Commonwealth, the evidence is sufficient to support the trial court's conclusion that Appellant and Mr. Saldana were engaged in an ongoing conspiracy and that they conspired to cut and package for sale the 377.73 grams of raw, uncut heroin that was discovered in Mr. Saldana's vehicle. Moreover, since the evidence is sufficient to support Appellant's conviction for criminal conspiracy, the evidence is also sufficient to support Appellant's conviction for the substantive offense of PWID with respect to the 377.73 grams of raw heroin. **Commonwealth v. Roux**, 350 A.2d 867, 871 (Pa. 1976) ("[w]here the existence of a conspiracy is established, the law imposes upon a conspirator full responsibility for the natural and probable consequences of acts committed by his fellow conspirator or conspirators if such acts are done in pursuance of the common design or purpose of the conspiracy"); **Commonwealth v. Perez**, 931 A.2d 703, 709 (Pa. Super. 2007) ("successful proof of a conspiracy makes each co-conspirator fully liable for all of the drugs recovered, without the necessity of proving constructive possession").

Appellant's sufficiency of the evidence claim thus fails.

For Appellant's second and final claim on appeal, Appellant contends that the trial court erred in sentencing him to the mandatory minimum sentence under 18 Pa.C.S.A. § 7508(a)(7)(iii), as "there was no proof that [] Appellant was in actual or constructive possession of the narcotics in question." Appellant's Brief at 17 (some internal capitalization omitted). Appellant's specific claim fails. Nevertheless, precedent from this Court requires that we *sua sponte* consider whether Appellant's mandatory minimum sentence is illegal. Because we must conclude that Appellant's sentence is unlawful, we are required to vacate Appellant's judgment of sentence and remand for resentencing.

In relevant part, 18 Pa.C.S.A. § 7508 provides:

**(a) General rule.**--Notwithstanding any other provisions of this or any other act to the contrary, the following provisions shall apply:

(7) A person who is convicted of violating [35 P.S. § 780-113(a)(30) ("PWID")] . . . where the controlled substance or a mixture containing it is heroin shall, upon conviction, be sentenced as set forth in this paragraph:

. . .

(iii) when the aggregate weight of the compound or mixture containing the heroin involved is 50 grams or greater: a mandatory minimum term of five years in prison and a fine of $25,000 or such larger amount as is sufficient to exhaust the assets utilized in and the proceeds from the illegal activity. . . .

. . .

**(b) Proof of sentencing.**--Provisions of this section shall not be an element of the crime.  Notice of the applicability of this section to the defendant shall not be required prior to conviction, but reasonable notice of the Commonwealth's intention to proceed under this section shall be provided after conviction and before sentencing.  The applicability of this section shall be determined at sentencing.  The court shall consider evidence presented at trial, shall afford the Commonwealth and the defendant an opportunity to present necessary additional evidence and shall determine, by a preponderance of the evidence, if this section is applicable.

18 Pa.C.S.A. § 7508(a)(7)(iii) and (b).

Appellant argues in his brief that the trial court erred in sentencing him to the mandatory minimum sentence under 18 Pa.C.S.A. § 7508(a)(7)(iii), as "there was no proof that [] Appellant was in actual or constructive possession of the narcotics in question."  Appellant's Brief at 17. We have already explained why Appellant's actual claim on appeal fails.  As was explained above, Appellant was convicted of participating in an ongoing criminal conspiracy with Mr. Saldana, which encompassed as its object the cutting and packaging of the 377.73 grams of raw heroin that was discovered in Mr. Saldana's vehicle.  Since the evidence was sufficient to support Appellant's conviction for participating in this ongoing conspiracy, the evidence was also sufficient to support Appellant's conviction for the substantive offense of PWID, with respect to the 377.73 grams of raw

heroin. ***Roux***, 350 A.2d at 871; ***Perez***, 931 A.2d at 709.[12] Hence, Appellant's claim on appeal fails.

Yet, we are required to vacate Appellant's judgment of sentence. A panel of this Court recently held that our *en banc* opinion in ***Commonwealth v. Newman***, 99 A.3d 86 (Pa. Super. 2014) (*en banc*) and the panel decision in ***Commonwealth v. Valentine***, 101 A.3d 801 (Pa. Super. 2014) mandate that we hold 18 Pa.C.S.A. §7508 unconstitutional in its entirety. Thus, a mandatory minimum sentence imposed under this statute is illegal.[13] ***Commonwealth v. Fennell***, 2014 WL 6505791, *1-8 (Pa. Super. Nov. 21, 2014). Specifically, the ***Fennell*** Court noted that 18 Pa.C.S.A. § 7508 is structured in the same manner as the statutes that were

---

[12] We also note that Appellant stipulated to the fact that the heroin weighed 377.73 grams (which constitutes heroin in the amount of 50 grams or more). 18 Pa.C.S.A. § 7508(a)(7)(iii); ***see*** N.T. Trial, 10/17/11, at 39-41 (Appellant stipulated to the authenticity and accuracy of the Bucks County Laboratory Report and to the chain of custody regarding the items tested); ***see also*** Bucks County Crime Laboratory Report, dated 11/23/10, at 1 (declaring that the substance in Mr. Saldana's vehicle was 377.73 grams of heroin).

[13] Although Appellant has not raised any issue relating to the legality of his sentence, we note that "[l]egality of sentence questions are not waivable and may be raised *sua sponte* by this Court." ***Commonwealth v. Watley***, 81 A.3d 108, 118 (Pa. Super. 2013) (*en banc*). Moreover, this Court has held that "a challenge to a sentence premised upon [***Alleyne v. United States***, ___ U.S. ___, 133 S.Ct. 2151 (2013)] . . . implicates the legality of the sentence and cannot be waived on appeal." ***Newman***, 99 A.3d at 90.

at issue in **Newman** and **Valentine**[14] – and, as was true with the statutes at issue in **Newman** and **Valentine**, one particular subsection of 18 Pa.C.S.A. § 7508 is clearly unconstitutional under **Alleyne v. United States**, _____ U.S. _____, 133 S. Ct. 2151 (2013).   **See** 18 Pa.C.S.A. § 7508(b).    In particular, Section 7508(b) contains the following unconstitutional burdens and procedures:  it declares that the substantive, "aggravating facts" contained in Section 7508(a) are "not . . . an element of the crime;" it declares that notice of either the "aggravating facts" or of the applicability of the mandatory minimum sentencing statute is "not . . . required prior to conviction;" it declares that the applicability of the mandatory minimum statute "shall be determined at sentencing;" it declares that the Commonwealth need only prove the "aggravating facts" by a preponderance of the evidence; and, it declares that a judge – and not a jury – is to act as the fact-finder for purposes of determining the "aggravated facts."  18 Pa.C.S.A. § 7508(b).  **Alleyne** rendered all of these burdens and procedures unconstitutional.

The Court in **Fennell** concluded that, pursuant to **Newman** and **Valentine**, the unconstitutional portion of 18 Pa.C.S.A. § 7508 is

---

[14] **Newman** dealt with 42 Pa.C.S.A. § 9712.1 (mandatory minimum sentence to be applied to a person convicted of certain drug charges when, at the time of the offense, said person or said person's accomplice is in physical possession or control of a firearm).   **Valentine** dealt with 42 Pa.C.S.A. § 9712 and § 9713 (mandatory minimum sentence to be applied to a person convicted of certain enumerated crimes of violence if said crime occurred in or near public transportation).

unseverable from the remainder of the statute. Thus, even though Fennell stipulated to the weight of the heroin at issue, the **Fennell** Court held that the trial court erred in imposing the mandatory minimum sentence as Section 7508 is unconstitutional in its entirety. Hence, as the Appellant in the case *sub judice* was sentenced to a mandatory minimum under Section 7508, which has been deemed unconstitutional, we must vacate Appellant's judgment of sentence and remand for resentencing, without consideration of the mandatory minimum sentence.

Appellant's convictions for PWID, possession of a controlled substance, possession of drug paraphernalia, and criminal conspiracy affirmed. Judgment of sentence vacated. Case remanded for resentencing only. Jurisdiction relinquished.

P.J.E. Ford Elliott and Judges Allen and Mundy join this opinion.

P.J.E. Ford Elliott files a concurring statement in which Judges Panella, Donohue and Lazarus join.

P.J. Gantman and Judge Panella concur in the result.

P.J.E. Bender files a concurring and dissenting opinion in which Judges Donohue and Lazarus join.

J-E01004-14

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>12/31/2014</u>