J.A21005/15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| KAALEEM WILLIAMS, | : | |
| | : | |
| Appellant | : | No. 1937 EDA 2013 |

Appeal from the Judgment of Sentence June 7, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division No(s).: CP-51-CR-0000450-2012

BEFORE: ALLEN, MUNDY, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                **FILED AUGUST 28, 2015**

Appellant, Kaaleem Williams,[1] appeals from the judgment of sentence entered in the Philadelphia County Court of Common Plea after he was found guilty of, *inter alia*, possession with intent to deliver controlled substances[2] ("PWID"), possessing a firearm with manufacturer number altered,[3] and conspiracy.[4]  He asserts the evidence was insufficient to sustain the verdicts and the imposition of a mandatory minimum sentence under 42 Pa.C.S. §

---

[*] Former Justice specially assigned to the Superior Court.

[1] The appeal of Appellant's co-defendant, Alex Banks, is pending at 1852 EDA 2013.

[2] 35 P.S. § 780-113(a)(30).

[3] 18 Pa.C.S. § 6110.2.

[4] 18 Pa.C.S. § 903.

9712.1[5] is illegal under **Alleyne v. United States**, 133 S. Ct. 2151 (2013).

We affirm the convictions, vacate the judgment of sentence and remand for

resentencing.

    The trial court summarized the evidence adduced at Appellant and the

co-defendant's joint suppression hearing and nonjury trial as follows:

> [T]he Commonwealth presented the testimony of Philadelphia Police Investigator Daniel Thompson and Detective Timothy Connell and the following facts were established. The Officers testified credibly that around 3:00 A.M. on December 6, 2011 five Philadelphia warrant officers arrived at 1716 North 55th Street in Philadelphia, Pennsylvania, to execute an arrest warrant for a resident of that address named Shaquita Brown. Three Officers were present, knocking on the front door while the remaining two Officers covered the rear of the property. Before entering the residence and during the subsequent search, Officers were under the belief that this property was a single family home. The Officer[s] testified that it was a regular twin house with a single front door with one doorbell and one lock. There was no intercom system, no sign of multiple mailboxes or apartment numbers or exterior locks on each door.
>
> After a few minutes of knocking, one of the tenants answered the door; the Officers identified themselves and explained that they had a warrant for Shaquita Brown. This tenant was shown a picture, stated that he did not know her, admitted the officers into the entryway of the first floor and subsequently into his room to search for Ms. Brown. The Officers' search of the room yielded no results

---

[5] Section 9712.1 provided, *inter alia*, that "[a]ny person who is convicted of [PWID] when at the time of the offense the person or the person's accomplice is in physical possession or control of a firearm, whether visible . . . or within the actor's or accomplice's reach or in close proximity to the controlled substance, shall likewise be sentenced to a minimum sentence of at least five years of total confinement."

and the tenant suggested that the Officers check the other rooms of the residence. The Officers proceeded to knock on the remaining doors in the hallway, following the same procedure of identifying themselves, stating that they were looking for resident Shaquita Brown, being admitted and searching the room. It took a few minutes of knocking on each door before they were answered and the inhabitants of each room appeared to have been sleeping with the lights turned off. The search of these rooms also yielded no results.

About twenty minutes after initially entering the building, the Officers reached the fourth and final door. Again, the Officers knocked on the door, which they described as a regular wooden bedroom door, and it took two to three minutes before [Appellant] responded asking, "Who's there?" The Officers identified themselves, [Appellant] opened the door, was shown a picture of Shaquita Brown and a copy of the arrest warrant. The Officers asked if they could enter the room to search for Ms. Brown and [Appellant] said "okay", agreeing to let them enter. . . .

Upon entering the room to begin their search, the Officers immediately noticed the co-defendant[, Alex Banks,] sitting on the bed. Both [Appellant] and co-defendant were fully clothed and wearing shoes. The room was described as similar to the others in the home — a regular style bedroom with an open doorway (but no door) leading into the bathroom. The room was small and contained only a twin sized futon bed; small refrigerator, broken dresser and television. The lights were on in addition to the television with the movie "Juice" playing.

As the Officers began their search for Ms. Brown in the room, Officer Jones approached the co-defendant who was seated on the bed to show him a picture of Ms. Brown for identification. Upon approaching [Appellant], the Officer looked to his left and saw what he believed to be narcotics in plain view in the broken dresser drawer that was completely missing its front panel. Officer Jones alerted the other Officers that there was something in the drawer—a "white-chunky substance" in plastic bags being held inside of a bigger clear plastic bag—that he believed

to be crack cocaine. Upon further investigation of the drawer, the Officers were also able to view the handle of a handgun which prompted them to secure [Appellant] and codefendant as a cautionary measure to ensure the Officers' safety. The Officers alerted their Sergeant to the discovery and were given orders to secure the scene and continue their search for Ms. Brown. While searching for her under the bed, an additional firearm, which they described as a "small submachine gun" with a bit longer barrel and a bigger clip was discovered. At the foot of the bed near the front door, a third handgun was recovered. The subsequent search of the bathroom also led to the discovery of "a big black trashbag" that was "full of marijuana"

Ms. Brown was not found in the room, so the Officers were ordered by their Sergeant to secure the contraband that they discovered by placing it in evidence bags, leaving them in the room, and transporting [Appellant] and co-defendant to the Southwest Detectives headquarters. [Appellant and the co-defendant] provided different home addresses, neither of which was that residence. Officers secured the front and rear of the residence when they arrived and no one was seen exiting. Based on the contraband discovered during the search for Ms. Brown, additional Officers obtained and executed a search warrant in order to recover the items. . . .

[T]he seizure analysis establish[ed] that 28.08 grams of crack cocaine were discovered in addition to 2.12 pounds of what tested positive as marijuana from the trash bags; that whoever possessed the drugs possessed them with the intent to deliver based on the amount, paraphernalia, scale and value—approximately $1,000 in crack cocaine and $3,000 in marijuana; the ballistics report establishing that two of the three firearms were operable at the time of recovery, while the third became operable after recovery and insertion of a new magazine; and that the serial number of the semi-automatic weapon was defaced by abrasion, gauging and restored by chemical etching.[6]

_____

[6] Neither Appellant nor the co-defendant testified at trial.

- 4 -

Trial Ct. Op., 7/14/14, at 2-6 (record citations omitted).  On January 25, 2013, the trial court found Appellant guilty of PWID, possessing a firearm with manufacturer number altered, and conspiracy.  On June 7, 2013, the court imposed an aggregate sentence of five to ten years' imprisonment, based, in part, on the mandatory minimum sentence in 42 Pa.C.S. § 9712.1.  This timely appeal followed.[7]

Appellant presents the following questions for review:

> Was not the evidence insufficient for conviction on all charges, insofar as the Commonwealth failed to prove that [Appellant] actually or constructively possessed the narcotics, paraphernalia, or firearms at issue, or conspired to do so?

> Was not [Appellant's] sentence illegal, in so far as he was subjected to a mandatory minimum sentence pursuant to 42 Pa.C.S. § 9712.1, which has been found to be unconstitutional?

Appellant's Brief at 4.

Appellant first claims the evidence was insufficient to sustain the trial court's verdicts because "[t]here [was] no evidence whatsoever that [he] lived in the apartment or was anything other than a transitory guest." **Id.** at 11.  He asserts the contraband was "hidden away in a dresser, under the bed, or in a black plastic trash bag in the bathroom" and there was "no evidence [he] ever exercised control[,] ever even touched them or knew about them." **Id.**  According to Appellant, "the facts here are far less

---

[7] Appellant timely complied with the trial court's order to file and serve a Pa.R.A.P. 1925(b) statement.

damaging than those" in cases where the evidence of constructive possession was found to be lacking. *Id.* at 13 (discussing *Commonwealth v. Rodriguez*, 618 A.2d 1007 (Pa. Super. 1993), and *United States v. Jenkins*, 90 F.3d 814 (3d Cir. 1996)). Similarly, Appellant asserts his mere presence in the apartment did not establish his participation in or knowledge of a conspiratorial agreement. *Id.* at 14-15. We are constrained to disagree.

Our review is governed by the following principles:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proof of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all the evidence actually received must be considered. . . .

*Commonwealth v. Bricker*, 882 A.2d 1008, 1014 (Pa. Super. 2005) (citation omitted).

> Constructive possession requires proof of the ability to exercise conscious dominion over the substance, the power to control the contraband, and the intent to exercise such

> control. Constructive possession may be established by the totality of the circumstances. . . .

*Id.* (citations omitted). However, "'[g]uilt by association is unacceptable.' Further, 'mere presence of one person, among a group at a scene of contraband, is not a strong factor indicative of guilt.'" ***Commonwealth v. Thompson***, 779 A.2d 1195, 1199 (Pa. Super. 2001) (citations omitted).

We note that in both ***Rodriguez*** and ***Jenkins***, the evidence established that other parties were responsible for the residence searched or the contraband found therein. In ***Rodriguez***, officers executed a search warrant on an apartment and arrested Joseph Aquino. ***See Rodriguez***, 618 A.2d at 1008. Aquino was identified as the perpetrator in a drug sale that gave rise to the search warrant, was in physical possession of contraband and cash, and had mail in his name in the apartment. *Id.* Officers recovered additional contraband in the apartment. *Id.* Officers also found the defendant hiding in a closet, next to a jacket with three baggies of cocaine inside a cigarette pack in the side pocket. *Id.* The defendant was arrested following a struggle. *Id.* The defendant had no contraband on his person and had no personal items in the apartment. However, he was in physical possession of a key to the apartment. *Id.* Following his conviction, this Court concluded the defendant's possession of the key and presence in Aquino's apartment was insufficient to prove constructive possession of the contraband. *Id.* at 1009. We emphasized there were no indication he

resided at the apartment, engaged in criminal activity, or was aware of the presence of contraband. *Id.*

In *Jenkins*, officers pursued two suspects into an apartment. *Jenkins*, 90 F.3d at 816. There, they found the defendant and another individual, Sam Stallings, seated on a couch, in their underwear, with three bags of cocaine, firearms, and paraphernalia for packaging the cocaine on the coffee table in front of them. *Id.* Stallings and one of the suspects who initially led officer to the apartment were identified as residents of the apartment. *Id.* at 817. The *Jenkins* Court reversed the defendant's conviction, concluding there was no "decisive nexus" between the defendant and the contraband beyond the evidence of his proximity to the contraband and his presence in Stallings apartment. *Id.* at 820.

Thus, *Rodriguez* and *Jenkins* emphasized the absence of a sufficient nexus establishing control over the contraband vis-à-vis a party implicated in the criminal activity. *See Rodriguez*, 618 A.2d at 1009; *see also Jenkins*, 90 F.3d at 820. Although it is well settled that "mere presence" is insufficient to establish constructive possession under those circumstances, this Court has also opined that a fact-finder

> need not ignore presence, proximity and association when presented in conjunction with other evidence of guilt. Indeed, presence at the scene where drugs are being processed and packaged is a material and probative factor which the jury may consider. Drug dealers of any size and [illegal drug] manufacturers probably are reticent about allowing the unknowing to take view of or assist in the operation.

> *United States v. Robinson*, 978 F.2d 1554, 1557–1558 (10th Cir. 1992) (internal quotations and citations omitted); *see also Rivas v. United States*, 783 A.2d 125, 138 (D.C. 2001) (*en banc*) ("a claim of innocent presence becomes decidedly less plausible in an environment (vehicular or otherwise) that is rife with evidence of ongoing drug production or distribution, such as a manufacturing or cutting facility, a warehouse, or a staging or preparation area where a large quantity of drugs or drug paraphernalia is exposed to view"); *United States v. Batista–Polanco*, 927 F.2d 14, 18 (1st Cir. 1991) (casting doubt upon the "hypothesis that participants in a [large-scale heroin packaging] scheme would permit a noncontributing interloper to remain for an extended period of time in a small apartment while their conspicuous criminal conduct continued unabated [since s]uch is not normally the conduct that one would expect of conspirators engaged in conduct which by its nature is kept secret from outsiders") (internal quotations, citations, and corrections omitted); *United States v. Staten*, 581 F.2d 878, 885 n. 67 (D.C. Cir. 1978) ("[i]t would seem that the voluntary presence of the accused in an area obviously devoted to preparation of drugs for distribution is a circumstance potently indicative of his involvement in the operation").

*Commonwealth v. Vargas*, 108 A.3d 858, 869 (Pa. Super. 2014) (*en banc*).

Instantly, the record, when viewed in a light most favorable to the Commonwealth, provided a reasonable basis for the trial court's finding that the "small room" in which Appellant and the co-defendant were found "was most likely used exclusively for packaging drugs." **See** Trial Ct. Op. at 12. We cannot disregard (1) the presence of $4,000 worth of narcotics— including the "giant garbage bag" containing marijuana and vials located near the shower, (2) the presence of multiple firearms—one of which had its

serial number obliterated, or (3) the absence of any paraphernalia for personal use. *See Vargas*, 108 A.3d at 869-70. The combination of these factors all strengthened the inference that the apartment was a location for securing narcotics that were packaged for future sales. *See id.*

Moreover, the evidence did not give rise to a suggestion of innocent presence in the room. *See Rodriguez*, 618 A.2d at 1009; *see also Jenkins*, 90 F.3d at 820. The only furnishings were a futon-style bed, a small refrigerator, a dresser, and a television. N.T., 1/25/13, at 30, 37-38. The dresser only contained "a T-shirt or two," and there was no evidence of mail addressed to any individual. *Id.* at 52-53. Both Appellant and the co-defendant provided police officers information that they did not live in the building. Neither Appellant nor the co-defendant had a relationship to the apartment or a legitimate occupant of the building, despite their presence in the apartment at 3:00 A.M.

We also note the record belies Appellant's assertion that he was unaware of the contraband. Instantly, the arresting officer testified the suspected cocaine and the handle of the firearm located in the broken drawer was immediately apparent. *See* N.T., 1/25/13, at 31-32. The record further established that the doorway to the bathroom was open, the trash bag in the bathroom was left open, and the vials and marijuana in the trash bag were similarly in plain view. *Id.* at 36, 39. Thus, we detect no

merit to Appellant's assertion that he had no knowledge of the narcotics or firearms.

In sum, we discern no error in the trial court's determination that Appellant and the co-defendant were not mere social visitors. Rather, based on the totality of the circumstances—including the nature of the apartment and the indicia that it was exclusively used to store contraband for sale—we conclude that the court was entitled to find that Appellant and the co-defendant constructively possessed the contraband. In contrast to *Rodriguez* and *Jenkins*, there was no evidence an identified party used the apartment to sell drugs or was responsible for packaging the drugs. Accordingly, we discern no merit to Appellant's arguments that the absence of evidence regarding his connection to the apartment or the contraband warranted relief.

With respect to Appellant's conspiracy conviction, we note that

> "to sustain a conviction for criminal conspiracy, the Commonwealth must establish that the defendant (1) entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and (3) an overt act was done in furtherance of the conspiracy." . . .

> The essence of a criminal conspiracy is the common understanding that a particular criminal objective is to be accomplished. Mere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient. Rather, the Commonwealth must prove that the defendant shared the criminal intent, *i.e.*, that the [defendant] was an active participant in the criminal enterprise and that he had knowledge of the conspiratorial

- 11 -

agreement. The defendant does not need to commit the overt act; a co-conspirator may commit the overt act.

"Proof of a conspiracy is almost always extracted from circumstantial evidence. The Commonwealth may present a 'web of evidence' linking the defendant to the conspiracy beyond a reasonable doubt. The evidence must, however, rise above mere suspicion or possibility of guilty collusion." We have held that, "[a]mong the circumstances which are relevant, but not sufficient by themselves, to prove a corrupt confederation are: (1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy."

*Vargas*, 108 A.3d at 873-74 (citations omitted).

As we have discussed above, the evidence gave rise to an inference that Appellant and the co-defendant were, at a minimum, participants in a conspiracy to store and secure narcotics for future sales. In light of that same evidence, we discern no basis upon which to disturb the trial court's determination that there existed a criminal agreement to so do. **See id.** Thus, no relief is due.

Lastly, Appellant claims his sentence, which was based on the mandatory minimum sentence under 42 Pa.C.S. § 9712.1, is illegal under **Alleyne**. Appellant's Brief at 45. The Commonwealth does not object to resentencing without reference to Section 9712.1. Commonwealth's Brief at 24-25.

This Court has held that Section 9712.1 is unconstitutional in its entirety. **See Commonwealth v. Newman**, 99 A.3d 86, 103 (Pa. Super.

2014) (*en banc*). Moreover, an **Alleyne** challenge is available to defendants whose cases are on direct appeal. ***See id.***; ***Commonwealth v. Riggle***, ___ A.3d ___, ___, 2015 WL 4094427 at *4 (Pa. Super. July 7, 2015). Therefore, we remand for resentencing "without consideration of any mandatory minimum sentence."[8] ***See Newman***, 99 A.3d at 103. Accordingly, we affirm the convictions, vacate the judgment of sentence, and remand this matter for resentencing.

Convictions affirmed. Judgment of sentence vacated. Case remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/28/2015

---

[8] We note that before trial, the Commonwealth also asserted that a mandatory minimum sentence under 18 Pa.C.S. § 7508, for the weights of the controlled substances, could apply. N.T., 1/25/13, at 6. However, Section 7508 has also been held unconstitutional in light of **Alleyne** and **Newman**. ***See Commonwealth v. Mosley***, 114 A.3d 1072, 1089-91 (Pa. Super. 2015).