J-A07012-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TODD JOHN DIXON | : | |
| | : | |
| Appellant | : | No. 947 MDA 2019 |

Appeal from the Judgment of Sentence Entered February 6, 2019
In the Court of Common Pleas of Lackawanna County Criminal Division at
No(s):  CP-35-CR-0002899-2016

BEFORE:  OLSON, J., DUBOW, J., and McLAUGHLIN, J.

MEMORANDUM BY OLSON, J.:                    **FILED JUNE 18, 2020**

Appellant, Todd John Dixon, appeals from the judgment of sentence entered on February 6, 2019, as made final by the denial of Appellant's post-sentence motion on May 29, 2019.  We vacate Appellant's disorderly conduct conviction, vacate Appellant's judgment of sentence, and remand for resentencing.

During Appellant's March 27, 2018 bench trial, Police Officer Riccardo Godino testified that, on August 6, 2016, he was working as a police officer for the South Abington Township Police Department.[1]  N.T. Trial, 3/27/18, at 17-18.  That day, Officer Godino was on-duty and working a special detail to aid the St. Benedict's Church Picnic.  He testified:

_____

[1] At the time of trial, Officer Godino testified that he was a cadet with the Pennsylvania State Police.  N.T. Trial, 3/27/18, at 17.

Four officers are typically assigned the duties of foot patrol and directing traffic. Officers create a temporary crosswalk by utilizing two marked patrol units with their emergency lights activated. . . . And officers are in full uniform. We wear the high visibility traffic vests. And two officers will typically cross families and people coming in and out of the bazaar across Newton Ransom Boulevard. The other two officers at that time are on foot patrol in the actual church picnic patrolling the grounds on foot and just ensuring officer presence for the safety and concern of anybody who is attending.

*Id.* at 19-20.

Officer Godino testified that, at the time he encountered Appellant, he and Officer Leonard Harvey were directing traffic and Officers Justin Brown and Anthony Percival were "coming up to relieve us." *Id.* at 20. He testified:

I [had just] cross[ed] a family from the church side of the road to the opposite side of the road. . . . At the time in question, [] the family was thanking me verbally for our assistance in safely crossing them across the road. . . . I had traffic stopped on Newton Ransom Boulevard which is a [45-mile-per-hour] road. . . . [Newton Ransom Boulevard] is a main road. It's a highway. I was in the middle of this highway with the intention[] of stopping any and all traffic to safely cross people. . . .

[O]nce the family was completely across the road, I [] directed my attention to another couple that was now crossing in the opposite direction going into the church picnic. When I directed my attention to this couple, I had noticed at the time it was [Appellant] and his wife. We made eye contact, [Appellant] and I. And I [] gave a nod with my head as if to say hello or acknowledge[] a hello. And [Appellant] at that point also, I assume, noticed it was [me]. [Appellant] recognized me. And he extended his hand out to me and gave me the middle finger. He also mouthed the words ["]fuck you["] to me. . . .

So, once the gesture was made to me . . . and he mouthed the words to me, I simply continued to look at [Appellant]

- 2 -

and I explained to him verbally[,] I said, "Sir, that's not very professional. This is a family establishment and that would constitute disorderly conduct, don't do that." The second I had finished that sentence, [Appellant] rapidly and very aggressively came at me. He approached me in a manner in which, I'm still in the middle of the roadway, all of my attention was directed at [Appellant] at the time. [Appellant] got himself and his body and his face within one inch of my face . . . in what I took at the time as a possible fighting stance or manner. . . . And he proclaimed with putting his finger in my face[,] saying, "Do you remember me asshole? Well, fuck you." At that point, I was in fear for not just my safety, but for the safety of [Appellant]. I was concerned. I wasn't too sure what his intentions were at the time. And quite frankly, it happened so rapidly, I wasn't really sure what his intentions were.

*Id.* at 20-23 and 49-50.

Officer Godino testified that, because of Appellant's actions:

All of my attention was focused on [Appellant]. . . . I lost the ability to concentrate on the approaching traffic from in front of me and the traffic from behind me and all of my attention was now directed at [Appellant]. And my official job of stopping traffic or ensuring the safety of others to cross was not able to be done at that point.

*Id.* at 23.

He further testified:

Because of the fact that I could not concentrate on anything around me and I wanted to ensure that both [Appellant] and I were out of the danger zone of being in the middle of that highway, I [] told [Appellant], I said, "Let's go, get off the roadway." And at that time, [Appellant] said, "Fuck you, I'm not going anywhere." And he more or less continued to carry on with his antics. So, I then said to [Appellant,] "Let's go, you're under arrest."

*Id.* at 23-24.

As Officer Godino testified, when he placed Appellant under arrest, he put his hands on Appellant's shoulder and "grabbed [Appellant's] wrist in an attempt to put it behind his back and direct him off the roadway." *Id.* at 24. However, Officer Godino testified:

> When I put my hands on [Appellant] in an attempt to guide him off the roadway . . . , [Appellant] attempted to pull away from me. He started by pulling his arms and his shoulders away from me in which I then had to tighten my grip to ensure that he did not pull away from me entirely and I lost complete control. [Appellant] then, if you could imagine, thrusted his hip and his groin area away from me as to try to gain the control and be able to pull away from me. The faster [Appellant] went in an attempt to run away from me or flee or make me lose grasp of him, the quicker I had to go. And I was more or less behind him catching up to his pace. . . .
>
> [The other officers saw] the struggle I was having with [Appellant]. In the attempt to [gain] control of [Appellant], Officer[] Brown and Officer Harvey came . . . to assist me. One officer was on each side of me and attempted to pull [Appellant] by a shoulder and his lower arm in the area of his elbow. And thankfully with the patrol car being there, it ceased [Appellant's] abilities to continue to run from police.

*Id.* at 24-25.

Officer Godino testified that, during the struggle, Appellant "did not respond to any commands. Any commands that were given to him, [Appellant] continued to just say, 'Fuck you, I'm not going anywhere.'" *Id.* at 25-26.

As Officer Godino testified,

> We used [the police] vehicle as leverage. And I was trying to gain enough control to be able to remove my handcuffs from my duty belt and place them onto [Appellant] while the other two officers held his arms in place for me. The issue

though was [Appellant] was continuing to struggle and resisting from us by actively and forcefully pulling his arms from behind his back and trying to get them to the front of his body. Officers had to maintain a high amount of control with this because [] we weren't sure what his actions were . . . we weren't sure if he was in an attempt to pull a weapon from his waistband or swing at officers in a manner. So I was able to get my handcuffs out while Officer Harvey and Officer Brown assisted me. And handcuffs were eventually placed on [Appellant] and secured behind his back in which time he continued to fight and resist our attempt to gain control.

*Id.* at 26.

As Officer Godino testified, after Appellant was handcuffed, Appellant's wife walked back towards them and began recording the incident on her cell phone. When Appellant saw his wife recording the incident, Appellant started "just screaming uncontrollably and very loudly." *Id.* at 28. The officers asked Appellant whether anything was wrong and Appellant "did not respond verbally in any way . . . [h]e just continued to scream." *Id.* at 28-29. Further, Officer Godino testified, Appellant then "dropped all of his weight . . . [h]e just passively resisted by going limp and officers had to hold him up at this point." *Id.* at 30.

The officers called for Emergency Medical Technicians ("EMTs") to evaluate Appellant. *Id.* To aid the EMTs in evaluating Appellant, Officer Godino eventually removed Appellant's handcuffs. *Id.* at 31-32. Appellant then cooperated enough to lie down onto the EMTs' stretcher and enter the ambulance, where volunteer Kelsey Landsiedel attempted to aid Appellant. *Id.* at 32 and 86-89.

Ms. Landsiedel testified that, once Appellant was placed on the ambulance, the ambulance drove off towards the hospital. She testified that, while in the back of the ambulance, she took Appellant's vital signs and began helping Appellant. *Id.* at 89-90. However, Appellant would not respond to her inquiries. She testified that, since Appellant was unresponsive, she performed a sternum rub. *Id.* at 90. As she testified, when she performed the sternum rub:

> [Appellant] lunged forward and swung his arm at me. I moved back in the seat away from him. And he said, "I will fucking kill you, don't touch me, let me fucking tell you." And I said, "I was just trying to make sure you were okay. You weren't responding to me." He was trying to get the seatbelt that was under his chest. And I at that point yelled to the driver to pull over, that we needed the police back because the patient was being combative.

*Id.* at 90-91.

Officer Godino testified that he and Officer Brown were following the ambulance in their patrol car when "the 911 dispatcher . . . came over the radio and . . . said that the [ambulance] is going to be pulling [over] . . . due to [Appellant] becoming combative." *Id.* at 32-33. As Officer Godino testified, after the vehicles pulled over, he and Officer Brown

> entered the ambulance through the rear. We opened up the two barn style doors and we could observe [Appellant] now flailing about and trying to wiggle himself out of . . . the restraint system that the [EMTs use] on a stretcher to prevent somebody from falling out of it. And [Appellant] was actively trying to free himself of this stretcher and he was screaming profusely. And when [Appellant] saw [me] and Officer Brown enter the ambulance, he said, "Oh, fuck you guys." And continued to scream and yell. Nothing very

- 6 -

specific in nature, but continued to be disorderly within the ambulance. So, . . . I told [Appellant], "At this time, due to your actions, I have to put the handcuffs back on you." And at that time, I did. I took the handcuffs out and I had to secure [Appellant] in front. . . . And then, we assisted the EMTs in resecuring [Appellant] with the straps that are on the stretcher to try to prevent his movement from coming out of the stretcher.

*Id.* at 33-34.

Officer Brown then stayed in the ambulance for the remainder of the ride to the hospital. *Id.* at 34.

The Commonwealth charged Appellant with aggravated assault, resisting arrest, and disorderly conduct.[2] Following a bench trial, the trial court found Appellant guilty of resisting arrest and disorderly conduct and not guilty of aggravated assault. *See* Trial Court Decision, 10/18/18, at 33-34.

On February 6, 2019, the trial court sentenced Appellant to serve a term of nine months of probation for the resisting arrest conviction and to serve a consecutive term of nine months of probation for the disorderly conduct conviction. N.T. Sentencing, 2/6/19, at 17. Following the denial of Appellant's post-sentence motion, Appellant filed a timely notice of appeal. Appellant numbers five claims in his brief:

> [1.] Did the Commonwealth present sufficient evidence at trial to support [Appellant's] disorderly conduct conviction?
>
> [2.] Was [Appellant's] conviction for disorderly conduct against the weight of the evidence presented at trial?

---

[2] 18 Pa.C.S.A. §§ 2702(a)(6), 5104, and 5503(a)(3), respectively.

[3.] Did the Commonwealth present sufficient evidence at trial that [Appellant] resisted arrest?

[4.] Was [Appellant's] conviction for resisting arrest against the weight of the evidence presented at trial?

[5.] Do [Appellant's] convictions for disorderly conduct and resisting arrest contravene public policy?

Appellant's Brief at 5.

First, Appellant claims that the evidence was insufficient to support his disorderly conduct conviction. We review Appellant's sufficiency of the evidence challenge under the following standard:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Vargas*, 108 A.3d 858, 867-868 (Pa. Super. 2014) (*en banc*), *quoting* *Commonwealth v. Brown*, 23 A.3d 544, 559–560 (Pa. Super. 2011) (*en banc*).

Appellant was convicted of disorderly conduct under 18 Pa.C.S.A. § 5503(a)(3). This section declares:

> **(a) Offense defined.**--A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:
>
> . . .
>
> (3) uses obscene language, or makes an obscene gesture[.]

18 Pa.C.S.A. § 5503(a)(3).

On appeal, Appellant claims that the evidence was insufficient to support his disorderly conduct conviction under Section 5503(a)(3), as his language and gesture to Officer Godino did not rise to the level of obscenity. Appellant's Brief at 19. We agree.

Our Supreme Court has explained:

> When the judiciary is required to resolve an issue concerning the elements of a criminal offense, its task is fundamentally one of statutory interpretation, and its overriding purpose must be to ascertain and effectuate the legislative intent underlying the statute. Generally, the clearest indication of legislative intent is the plain language of the statute itself. As [the Pennsylvania Supreme Court has] stated:
>
> > To determine the meaning of a statute, a court must first determine whether the issue may be resolved by reference to the express language of the statute, which is to be read according to the plain meaning of the words. It is only when the words of the statute are not explicit on the point at issue that resort to statutory construction is appropriate. However, basic principles of statutory construction demand that when the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit,

> and legislative history may be considered only when the words of a statute are not explicit.
>
> **Commonwealth v. Dellisanti**, 876 A.2d 366, 369 (Pa. 2005). Moreover, every statute shall be construed, if possible, to give effect to all its provisions.

**Commonwealth v. Fedorek**, 946 A.2d 93, 98-99 (Pa. 2008) (corrections and some quotations and citations omitted).

Section 5503(a)(3) specifically prohibits the use of "obscene" language or gestures, when the language or gestures are done "with [the] intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof." 18 Pa.C.S.A. § 5503(a)(3). As this Court has explained, "for purposes of [Pennsylvania's] disorderly conduct statute prohibiting the use of obscene language, language is obscene if it meets the test set forth in **Miller v. California**, 413 U.S. 15 (1973)." **Commonwealth v. McCoy**, 69 A.3d 658, 665 (Pa. Super. 2013). Thus, language or gestures are obscene if they satisfy the following elements:

> (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest, (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

**Id.**, quoting **Commonwealth v. Bryner**, 652 A.2d 909, 912 (Pa. Super. 1995).

Here, the evidence demonstrates that Appellant communicated multiple profanities to Officer Godino. However, giving a person the middle finger and

telling a person "fuck you" in an antagonistic manner does not describe sexual conduct and does not appeal to anyone's prurient interest. ***See McCoy***, 69 A.3d at 666 (the defendant shouted "fuck the police" multiple times during a funeral procession for a fallen officer; the Superior Court held that the evidence was insufficient to support the defendant's disorderly conduct conviction under Section 5503(a)(3) because "there is no evidence that the chant was intended to appeal to anyone's prurient interest nor did it describe, in a patently offensive way sexual conduct"). Thus, the evidence is insufficient to support Appellant's disorderly conduct conviction.[3]

Next, Appellant claims that the evidence is insufficient to support his resisting arrest conviction.

A person commits the crime of resisting arrest "if, with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty, the person creates a substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring substantial force to overcome the resistance." 18 Pa.C.S.A. § 5104. Thus, "Section 5104 criminalizes two types of conduct intended to prevent a lawful arrest: the creation of a substantial risk of bodily injury to the officer or anyone else **or** means justifying or requiring a substantial force to overcome." ***Commonwealth v. Soto***, 202 A.3d 80, 95 (Pa. Super. 2018) (emphasis in original). Further, as we have held, "a valid charge of resisting arrest requires

---

[3] Given our disposition, Appellant's second numbered claim on appeal is moot.

an underlying lawful arrest, which, in turn, requires that the arresting officer possess probable cause." *Id.* at 96 (quotations and citations omitted).

Appellant claims that the evidence is insufficient to support his resisting arrest conviction because: 1) "[i]t was only after [Officer Godino placed Appellant under arrest] that [Appellant] showed any signs of resistance;" 2) "the trial record is devoid of any evidence that [Appellant's] actions put the officers at substantial risk of bodily injury;" 3) Appellant's "apparent attempt to flee does not constitute resisting arrest;" and, 4) Appellant's underlying arrest was unlawful. Appellant's Brief at 28-29. Appellant's claims fail.

Appellant's first sub-claim contends that the evidence is insufficient to support his resisting arrest conviction because he did not resist until after Officer Godino placed him under arrest. *Id.* at 28. We do not understand Appellant's claim. Indeed, we have held that "a valid charge of resisting arrest **requires an underlying lawful arrest**." *Soto*, 202 A.3d at 96 (emphasis added). Therefore, the fact that Appellant began resisting after he was placed under arrest is a *sine qua non* of the crime of resisting arrest. Appellant's first sub-claim thus fails.

Next, Appellant claims that his resisting arrest conviction cannot stand because he did not "put the officers [or anyone else] at substantial risk of bodily injury." Appellant's Brief at 28. This claim is frivolous. As the trial court explained: "[b]y precipitating a physical struggle in a temporary crosswalk over a 45 mph highway, [Appellant] did create a substantial risk of injury to [the officers] and the public patrons and families using the temporary

- 12 -

crosswalk." Trial Court Opinion, 10/18/18, at 19. Appellant's claim to the contrary is frivolous and, thus, fails.

Appellant's third sub-claim contends that his "apparent attempt to flee does not constitute resisting arrest." Appellant's Brief at 28. However, we have already determined that the evidence is sufficient to support the conclusion that Appellant's actions "create[d] a substantial risk of bodily injury to the" officers and the public. Thus, we need not consider whether the evidence was also sufficient to support the alternate element of resisting arrest – that Appellant "employ[ed] means justifying or requiring substantial force to overcome the resistance." *See* 18 Pa.C.S.A. § 5104; *see also Soto*, 202 A.3d at 95. Appellant's third sub-claim is moot.

Finally, Appellant contends that his resisting arrest conviction must be vacated because it was not supported by a valid underlying arrest. Appellant's Brief at 29. This claim fails.

Even though we have concluded that the evidence is insufficient to support Appellant's conviction for disorderly conduct under Section 5503(a)(3), this conclusion does not mean that Appellant's arrest was unlawful. To be sure, in this case there existed probable cause to arrest Appellant for any number of crimes, including disorderly conduct under Section 5503(a)(1).[4] This is because: Appellant began swearing at Officer

---

[4] 18 Pa.C.S.A. § 5503(a)(1) declares: "A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly

Godino and then aggressively rushed at the officer while the officer was on-duty and engaged in a job that required him to escort families across a 45-mile-per-hour highway; Officer Godino testified that, based upon Appellant's aggressive behavior, the officer feared for his safety; and, after Officer Godino told Appellant to leave the middle of the highway, Appellant said "Fuck you, I'm not going anywhere." Appellant's aggressive, violent, and threatening actions – which occurred on a public highway and in the middle of a public function – provided Officer Godino with probable cause to arrest Appellant for (at a minimum) disorderly conduct under Section 5503(a)(1).[5] As such, Appellant's final sub-claim fails and we conclude that the evidence was sufficient to support Appellant's resisting arrest conviction.

Next, Appellant claims that his resisting arrest conviction was against the weight of the evidence. This claim is waived, as Appellant's post-sentence motion merely presented a boilerplate challenge to the weight of the evidence. *See* Appellant's Post-Sentence Motion, 2/12/19, at 1-3; ***Commonwealth v. Holmes***, 461 A.2d 1268, 1270 (Pa. Super. 1983) (*en banc*) (holding: "a

---

creating a risk thereof, he: (1) engages in fighting or threatening, or in violent or tumultuous behavior." 18 Pa.C.S.A. § 5503(a)(1).

[5] Indeed, during trial, Appellant's counsel admitted that there was sufficient evidence to support Appellant's conviction under Section 5503(a)(1). ***See*** N.T. Trial, 3/27/18, at 124 ("And the disorderly conduct that he's charged is 5503(a)(3). . . . **If he was charged with 5503(a)(1) or 5503(a)(4), there is no argument here**. But the Commonwealth can't get up here with its charging document and take a square peg and try to ram it into a round hold. They charged it.") (emphasis added); ***see also id.*** at 124-130.

post-verdict motion, [] that . . . 'the verdict was against the weight of the evidence,' will preserve no issue for appellate review unless the motion goes on to specify in what respect . . . why the verdict was against the weight of the evidence").

Finally, Appellant claims that his conviction for resisting arrest contravenes public policy. Appellant's Brief at 30. According to Appellant, "[a]llowing law enforcement officers to arrest individuals who are merely exercising their right to free speech under the First Amendment is an outrageous result that should not be affirmed by" the Superior Court. *Id.* This claim is frivolous.

In *Chaplinsky v. New Hampshire*, the United States Supreme Court declared:

> Allowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.

***Chaplinsky v. New Hampshire***, 315 U.S. 568, 571-572 (1942) (citations, footnotes, and some quotations omitted).

As was already explained above, the evidence in this case is sufficient to support Appellant's resisting arrest conviction.[6] Certainly, in this case: Appellant repeatedly swore at Officer Godino and then aggressively rushed at the officer while the officer was on-duty and engaged in a job that required him to escort families across a highway; Officer Godino testified that, based upon Appellant's aggressive behavior, the officer feared for his safety; after Officer Godino told Appellant to leave the middle of the highway, Appellant said "Fuck you, I'm not going anywhere;" and, after Officer Godino told Appellant he was under arrest, Appellant began resisting the officer in the middle of a highway, where the posted speed limit is 45 miles per hour. Simply stated, Appellant's aggressive actions in this case threatened to "incite an immediate breach of the peace" and, thus, went far beyond the limits of what the First Amendment protects. ***See id.*** As such, Appellant's final claim on appeal fails.

In conclusion, we vacate Appellant's disorderly conduct conviction. Further, since our decision may have disturbed the trial court's sentencing scheme, we remand the case for resentencing.

---

[6] We need not address this public policy issue as it relates to Appellant's disorderly conduct convictions as we are vacating that conviction.

Judgment of sentence vacated.   Case remanded for resentencing.

Jurisdiction relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/18/2020